Aloha and good morning, Your Honor. My name is Robert Klein. Together with Dana Kamimura-Ching, we represent the estate of Gay Glazer through the personal representative duly appointed, Kathleen Conahan. May it please the Court, Gay Glazer passed away this year, four and a half years after defendant Kaiser Foundation Health Plan made its facilities and services unavailable to her in October of 2006 for urgently needed surgery because Kaiser's doctors erroneously determined that her cancerous liver tumor was inoperable. Counsel, is there anything in the record that would indicate whether the surgery that occurred caused her death? No, no, Your Honor. So it's just speculation on anybody's part? Well, she died four years after she had the trisegmentectomy that saved her life for four and a half years. Why she passed away at age 79 is probably related to cancer reoccurring, but she had four and a half years. But it wasn't an approximate causation from your perspective? Yes, sir. Okay. She lived in health during these last four and a half years independently. She traveled the world. She saw her grandkids graduate from high school and enter college, perform in the arts. She stayed healthy, enjoyed her life immensely. After the successful surgery, gave it back to her. She died at age 79. Dr. Klein, is that the evidence that we must consider, or do we look at the evidence as of the time that Kaiser made the determination in order to determine whether or not there was error in the denial of the coverage? Well, I think you look at it primarily from the time that Kaiser made the decision that the tumor was inoperable. But I think you have to also weigh against that the fact that it wasn't inoperable because it was successfully operated upon. Well, I don't know. I mean, if you want to go down that road, isn't there some evidence with regard to the pathology that the surgery didn't get adequate margins in order to get all of the cancer, and in fact that there were complications that arose immediately after the surgery which kept her hospitalized both on Maui and at Kaiser for quite some time? I don't disagree with you, Judge. I certainly agree that when 70% of your liver is taken, you're going to have a difficult recovery period when you're 74 years old, even though if you're in good health. Which is what concerned the tumor board of the 30 doctors who looked at whether surgery was a viable option. Correct. Correct. But on the other hand, they also told her that if she didn't have the surgery, she would pass away within three to five months, and if she did, she might not make it out of the operating room. And that's why the tumor was inoperable. But I would submit to you that the reason that I raise this issue is because she had four and a half years of extremely good life after the successful surgery that Kaiser said could not occur without her dying. So I put that just in juxtaposition to yes, they did make a decision. It was a medical decision that it was an inoperable tumor. I don't know what the skill level of their doctors is. All I know is she was able to find one doctor, the first doctor she talked to, the first surgeon who gave her four and a half years of successful life thereafter. Can we go back to the legal standard, though? It's finite. It seems to me that your definition or interpretation of urgently needed services, being as it is, wouldn't any medical advantage organization be required to pay for out-of-network care whenever they declined to provide the service? Where's the break on this? Is there any break? Yeah. I think the break is if you look at the definition of urgently needed care, it's really a two-part definition. The first part turns on the system providing the service being temporarily unavailable. Okay. In this case, we submit to the court that Kaiser made its services unavailable when they gave her two options, die or die. But they had a 30-person board, the tumor board, who reviewed this. The only doctor on that board who disagreed was the one who performed the surgery, the only one. If we ran our court system that way, we'd never be able to do anything, would we? If everybody had to unanimously agree, there could be no decision? Well, first of all, Dr. Lynn Hurtubise who did the surgery was not on the board. He wasn't one of the people that was consulted as part of the tumor board? No. He was in disfavor with Kaiser, as you can tell by Dr. Matayoshi's email on October 11th, and so was Maui Memorial Hospital. The tumor board, we don't know who even these 30 people are. They could be dermatologists, for all I know. But they're certainly affiliated with Kaiser. They're also Kaiser surgeons who were consulted, and they made a medical determination that she could not be operated upon. I only mention that Dr. Lynn Hurtubise successfully performed the surgery because it seems passingly strange that one random surgeon came to the conclusion that he could actually do this in a skillful way and save her life for four and a half years. Go ahead. That's what he did. So my first question is, what is our standard review, and what are we reviewing? Is it the ALJ's determination, or is it the Medicare Appeals Council determination? First of all, what we're reviewing today is a determination by the district court judge, which gave great deference to the Medical Appeals Council's determination. The district judge applied the substantial evidence test, which I think is correct. The district judge said if there's substantial evidence to support the factual findings of the Medical Appeals Council, then his hands were tied. He had to accept those as facts, and he relied on those facts in concluding that Kaiser did not make its services and facilities unavailable to Mrs. Glaser. So you agree with Judge Ezra that the substantial evidence is the test? Absolutely. All right. But I call the court's attention to this court's Pogue case. In the Pogue case, this court describes what substantial evidence can consist of when there is an administrative law judge involved. And in the Pogue case, give me a second to find that, which is a 1991 case from the Ninth Circuit. The court stated that consideration of the ALJ's findings require a more searching scrutiny of the record. Special deference is to be given the ALJ's credibility judgments. A finding of the full board, and in this case you could substitute the MAC, that rests solely on testimony discredited by the ALJ is not supported by substantial evidence and cannot be sustained. And can you point me to that portion of the ALJ's findings that make an adverse credibility determination? Yes, I can. The ALJ says, Your Honor, that Kaiser's denial notice was based on the claim that urgently needed services were available through the plan, and he called it disingenuous at best. That's discrediting a legal argument, and as I understand Pogue, it's talking about an adverse credibility finding with regard to actual witnesses that the ALJ was in a better position to hear. So let me ask the same question again. Can you point me where in the record the administrative law judge makes an express adverse credibility finding with regard to any of Kaiser's witnesses? Certainly can. And I'm confused because I'm looking at page 12, ER, I believe it's 239, in which he accepts all the medical opinions of all the physicians involved as based upon their best medical assessment of the appellant's condition at the time. That doesn't sound to me like he's discrediting any of the physicians. Let me call your attention to page 257 on the record, which is page 13 of the ALJ's findings. That page, if you read it, you'll find numerous credibility determinations by the ALJ where he basically discredits. Just give us one. I have that page in front of me and I don't see it. Okay. The record shows that the MAO, which is Kaiser, offer of a second oncology opinion was not What paragraph are you in? This is full paragraph 1, 2, 3, 4. The record also shows? Yes. All right. Go ahead. The record also shows that the MAO's offer of a, quote, second oncology opinion was not going to be used to obtain viable options, but to ensure the appellant's acceptance of the MAO's diagnosis. Well, Mr. Kline, that gets back to Judge Tallman's question that you're talking about legal points. The Pogue case talks about the review of the ALJ's, if you will, view of an individual and that individual's testimony, and I think you're talking about Matayoshi's testimony here. That's not even mentioned, I don't believe, by the ALJ. How does the Pogue case figure into this? Well, with all due respect, that is a factual determination, not a legal determination. What? Whether a second opinion has been offered by Kaiser. But it's not an analysis or a review of the testimony of any particular person, is it? Yes, it certainly is. It goes on to say, as noted by Dr. Takamori, the scheduled second opinion was to, quote, discuss her plans for being explored elsewhere. Now, that means her plans to get surgery at Maui Medical through Dr. Lynn Hurtubise. That's a directly contrary factual determination because what Judge Ezra relied on and the MAC relied on was this concocted idea that if she just kept her appointment, she would be told about chemoimmobilization, shrink the tumor, and then at that point in time, resect it. Didn't she have an appointment with a Kaiser oncologist? She did. That she didn't make? Absolutely, she didn't make it. Okay, so we don't know what the oncologist would have said to her because she didn't make the appointment, so it never happened? Correct. But the oncologist and Dr. Takamori had the opportunity to speak to her before her surgery, provide her with that option. Dr. Takamori, as I understood it, was the chief of surgery. He's not an oncologist, and as I read the record, he didn't talk to her about chemotherapy or anything. He was talking to her about the fact that she announced that she was going to Maui to have the surgery done, and he was trying to say, look, before you do that, please come and see our oncologist. And Dr. Marioshi wasn't her doctor either, but he testified that he believed that there was this team modality approach and that if she just kept her appointment, this was going to be explained. How does he know that? Let me go back to my question. He wasn't her doctor either. Where in that statement is there a credibility determination that Dr. Takamori was not testifying truthfully when he said that he wanted to talk to her about her plan? Well, first of all, Dr. Takamori was not a witness. He did not testify. Only Dr. Marioshi testified. Then it can't be an adverse credibility finding because he was never a witness. It's adverse because Dr. Marioshi testified that if she had kept her appointment, the second option, the chemo immobilization, first of all, it's a direct credibility because this ALJ listened to the testimony, heard the witness, judged the witness's credibility, and found him incredible. Counsel, you're down to about a minute and a half of time. You may reserve or use it either way. I'd be happy to reserve or judge. Very well. You may do so. Thank you. Harry Yee is the United States Attorney representing Secretary Sebelius of the Department of Health and Human Services. See, I noticed that there's also an indication that Diane Brookins may also wish to argue. Yes, Your Honor. Ms. Brookins is the co-appellee's representative in this case. She represents Kaiser Permanente. Is it allocated to 15 minutes between you? Yes, Your Honor. Five minutes for myself, Your Honor, I think, and 10 minutes for Ms. Brookins. Before I begin, Your Honor, this morning, I'd like to offer my personal condolences to the appellant for the passing of Mrs. Glazer. Thank you. I had the opportunity to meet her during the course of this case and offer my condolences to her counsel and her family. Your Honor, I think that it's important for the case before the court to recognize that not only did the Medicare Appeals Council and the district court review the record that was before the ALJ, but that they found that Mrs. Glazer never offered the opportunity to Kaiser to offer up those opinions. And really, that's the key here, Your Honors, that whether or not you believe Mr. Klein and his argument that those were contrived arguments after the fact to cover up the improper decision of a 30-plus board set of doctors on the tumor board, that's not really the point here. The point here is she had two appointments scheduled within, I believe, the opinion about her carcinoma came out on September 27th, 2006, and she had her first appointment scheduled for October 11th and then another one scheduled for October 12th, both of which Mr. Klein clearly admits she missed. She decided not to go through. Well, she was scared, right? I mean, she'd basically been given a death sentence by the first doctors that she consulted with. I beg to differ with you, Judge Tallman. I think what she was told was she had cancer. She had an aggressive cancer. She was not given, as Mr. Klein says, a death sentence. She was offered. But she thought. I mean, isn't that why she wanted to act so quickly, because she was afraid that she was talking about a matter of weeks? And having faced that in my personal life, Judge, I understand the emotion behind that. I do, too. That's a perfectly understandable human reaction. And what's before this Court is whether or not the Medicare Appeals Council and Judge Ezra, in his opinion, did a proper review of what Kaiser Permanente decided. Well, the substantial evidence test controls, presumably. Both you and your opposing counsel agree on that. Absolutely are. All right. What's your response to Mr. Klein's challenge to what he tries to identify as credibility determination? I think if Your Honor looks at the answering brief filed, in this case by our office, at page 16, we go into detail in footnote 4 about what that standard of review entails in terms of a credibility determination of a particular witness. And we cite to the Court's decision, and I apologize for the pronunciation, Your Honors, Arolumpopalma v. Ashcroft, which is at 353 Fed 3, 679 at page 686. It's a 2003 case. And the Court said that the administrative law judge must also provide specific examples of the petitioner's demeanor that would support the basis for an adverse credibility finding. That didn't happen here. I think Judge Smith clearly identified the fact that that wasn't a credibility finding, that that was, in fact, a determination, a conclusion of law by the administrative law judge. And I'd like to correct another thing, Your Honors. The administrative law judge process in this case, and there are several levels of review, the administrative law judge process is not at the same level of the Medicare Appeals Council. The Medicare Appeals Council, under the federal regulations, clearly is the final administrative decision of the agency. And that's where the Court's review of this case starts. Mr. Klein has mentioned that his client survived for approximately four years after her surgery. Is that a matter that should bear on our decision in this case, or are we confined to the legal standard that applies to the decision made by the MAC at the time that it made it? I think that's exactly the standard, Your Honor. To rely on what happened to Mrs. Glaser after the operation would entitle me, and entitle Kaiser Permanente, to make the same argument had she kept those appointments. I mean, could she have lived longer than four and a half years, Your Honor? And I certainly recognize the emotional appeal this case has before this Court, and I sympathize with the arduous decision that Mrs. Glaser had to make at the time she made the decision. But that doesn't change the application of the rules in this case, and the requirement that there be substantial evidence to support the decision in this case. And I think both the Medicare Appeals Panel recognize that. Counsel, you consumed six of your 15 minutes. Thank you, Your Honor. You may do so. Good morning, Your Honors. Diane Winter Brookins on behalf of Defendant Intervenor Kaiser, Appellee, Kaiser Foundation Health Plan. May it please the Court. The crux of the issue that we have here today is, of course, whether there was substantial evidence to support the decision of the Medicare Appeals Council. The Medicare Appeals Council went very thoroughly through the record, considered, weighed all of the evidence, and did credit Dr. Matayoshi's testimony that had Ms. Glaser kept her appointment with the Kaiser oncologist on the 11th, which was the day she instead flew to Maui to consult with Dr. Lin about the out-of-plan, out-of-network surgery. But we have a contrary determination made by the administrative law judge prior to the MAO decision. On the credibility issue. Help us sort that out. Thank you, Your Honor. What Mr. Klein has focused on is the language on page 13 of 14 of the ALJ decision, where the ALJ says, The record also shows that the MAO's offer of a second oncology opinion was not going to be used to obtain viable options, but to ensure the appellant's acceptance of the MAO's diagnosis. As he goes on and quotes Dr. Takamori, what we have here is a confusion by the ALJ between Dr. Takamori, who was the surgical oncologist, and the medical oncologist that Ms. Glaser was due to see on the 11th. Ms. Glaser never did consult with the Kaiser oncologist before she went out of plan for the surgery by Dr. Lin. The oncologist, the medical oncologist within the Kaiser framework, is the professional who would have advised Ms. Glaser on non-surgical options. The finding by the tumor board and the Kaiser general surgery department was that at that point in time, given the size of the tumor and its location, it was inoperable. The beauty of Kaiser is that it is a very multidisciplinary approach. A surgeon looks at cutting. That's what surgeons do. And they're very, very good at it. And it is frequently a very important part of a medical protocol to deal with a cancer. But the Kaiser approach is to pull in various different disciplines. And in this case, the plan would have been to have her treat the cancer with chemo to get it small enough to the point where it could be surgically removed and leave more viable liver and also allow for clean margins. If you do a surgery and do not allow for clean margins, there's really no point in doing the surgery. If you're leaving cancer in the body, then you incur the risks of the surgery with no real benefit. Now, we're all very glad that Ms. Glaser survived as long as she did. And she was a tremendous patroness of the arts in Hawaii. We all benefited greatly from those additional four years of her life. But sitting here, we don't know. You know, she may have had those same years. She may have had more. We don't know because she didn't keep that appointment with the Kaiser oncologist. Reading the ALJ's opinion as a whole, there really is no support for the proposition that he discredited Dr. Matayoshi's testimony. He never acknowledged it. He didn't actually even acknowledge it, did he? He didn't acknowledge that Dr. Matayoshi even testified at the hearing. And then he never quotes the testimony about the chemoembolization to shrink the tumor, much less makes findings, I didn't believe him. Mr. Klein, it mentions the Pogue case. How does the Pogue case apply in the context of how the ALJ treated Dr. Matayoshi's testimony or not treated as the case may be? Well, in the Pogue case, the ALJ made express findings and said, I don't believe the supervisor because the self-interest, you know, there were actual express findings made. I think the other case, which of course did not happen here, the other cases that appellant has cited in her reply brief, the Andrzejewski case, now that was an FAA case and that agency has expressly taken the position that credibility determinations by the ALJ will be accepted, will be acknowledged. So from the Kaiser's perspective, then Pogue really has nothing to do with this case because there was no credibility determination made of Dr. Matayoshi's testimony. Is that correct? I think Pogue is an opposite on that basis, Your Honor. I believe Andrzejewski is an opposite on that basis, as well as the fact that there's a different standard of review. With respect to the Medicare Appeals Council, the MAC is not bound by credibility determinations by the ALJ. The Howard case that appellant also cited in her reply brief specifically says that the Appeals Council is not bound by credibility determinations by the ALJ. So even if there had been credibility determinations, they would not have been binding on the MAC under this appellate structure. The Howard case does say that if the ALJ makes credibility determinations and the MAC disagrees, they have to support it. But we didn't have credibility determinations for the Medicare Appeals Council to disagree with. The MAC reviewed the entire record, weighed all the evidence, and concluded that there was substantial support in the record for the fact that Kaiser had a treatment plan for Ms. Glaser, had she but kept her appointment. Since both parties seem to agree that the standard for review here is substantial evidence and the MAC's decision was the agency's final decision, what role, if any, does the Heckler case play? The Heckler case is not coming back to me immediately, Your Honor. That's a Supreme Court case indicating that the factual determinations have to be upheld if they are supported by substantial evidence. Well, that would apply to the decision of the MAC then, Your Honor. Right. And they are supported by substantial evidence. In fact, the evidence is uncontroverted. There was no contrary evidence as to what Ms. Glaser would have been told had she kept her appointment with the oncologist on the 11th. So there was no evidence to weigh. There were no adverse inferences. So from your perspective, all we're really looking at is the MAC. We're not really looking at the ALJ's determinations because no determination was made that would bear on the outcome of this case. That's right, Your Honor. That's right, Your Honor. If the ALJ had expressed credibility determinations and the MAC disagreed with them, the MAC would have had to state the basis for its disagreement. But because the ALJ did not make credibility determinations, the MAC looked at the record, de novo, and as long as there was substantial evidence to support the MAC's decision, then the decision by Kaiser Foundation Health Plan must be upheld. Appellant also focused quite a lot on the urgently needed services exception to the requirement that all services be obtained in plan, if I could touch on that for a moment. Your question toward the very beginning of argument, wouldn't this lead to a situation where any time a service is denied, they can say, well, it's urgent because you've made your services unavailable to me, so I get to go somewhere else and you have to pay for it. That's exactly the situation that it would create, which is why when CMS promulgated that rule, they made a point. There was a question actually posed. How would this come into play if a member is denied services? Could they rely on this rule to go out of plan? And CMS, in promulgating the rule, said, no, not at all. That would be something they could appeal. But it would not be a basis for obtaining urgently needed services because the services are not unavailable. Kaiser made its services available to Ms. Glaser. Unfortunately, she did not avail herself of those services. And that's the problem with which we find ourselves. I believe that's all I had, unless the Court has questions. No further questions. Thank you, counsel. Thank you very much. Mr. Kline, you have some reserve time. Dr. Matayoshi was noted as being a witness at the hearing by the ALJ. The ALJ mentions him on page 257 of the record many times. It's not that Matayoshi was ignored. There's a citation to his affidavit by the hearing officer. There are many citations to things that Dr. Matayoshi testified to on the telephone. We're talking about someone who participated by phone and submitted an affidavit. Admittedly, what you say is correct in terms of it being in the record, but did the ALJ, when making a determination and reasoning that determination, was there any reference to what Dr. Matayoshi had said or quoted that was woven into the reasoning of the decision? I believe there was. I would submit there was. Page 257. The first full paragraph, as noted in Dr. Matayoshi's affidavit, which is testimony, and he goes on to quote, ALJ quotes two paragraphs from Dr. Matayoshi's affidavit. Actually, one is from his e-mail, which the ALJ actually read too. Does an e-mail fit into the POG analysis or is that more like testimony? It figures into the POG analysis because the e-mail that Dr. Matayoshi sent on October 11th, the day before the surgery, which we're supposed to believe informed Mrs. Glaser that there was this process of chemoembolization and that she could shrink the tumor and then possibly have surgery. Telling this to someone who is terminal is nonsense, by the way. She had about a month to live. She was deemed terminal and her tumor was inoperable. So to say, go to your oncology appointment and you're going to find out how we're going to shrink the tumor and then maybe if it shrinks we may resect it is certainly not a viable option to anyone who's been diagnosed with death. You're a good lawyer, Mr. Klein, and I appreciate the emotional appeal of what you're talking about, but we're not talking about an eternal risk plan here. We're talking about what the rule of law is in terms of at what point do we decide what are the rules that we apply in this situation. You've got somebody who had this very terrible disease, apparently a really outstanding citizen. You have a board set up. The board made a determination. She came up with a different conclusion. We all check out at some point.  What's the standard that we apply? It sounds to me like what you're saying is that because she was put in this terrible situation that what we should do is to say that because she was put in this situation and they didn't give her what she wants, then she's entitled to relief. Is that what you're saying? Not at all. Absolutely not what I'm saying, Your Honor. This is not about emotion. This is about someone who is told by the chief of surgery at Kaiser, you're going to die if you have the surgery, which is the only viable option, or you're going to die if you don't have the surgery. Now, you would think that there would be something in the evidence in the record where Dr. Mario, she would say, but we have another plan for you, Mrs. Glazer. If you keep your oncology appointment, you're going to find out about how our modalities work at Kaiser and how we work together as a team, and you're going to find out about shrinking tumor. You don't think that that would get her attention to the point where she would say, wow, that's better than a risky surgery where I might lose 80% of my liver and not make it out of the recovery room. If they had told her that, which is an inference that the ALJ is entitled to make from the testimony and from the evidence, you don't think that she would have taken that option, the less risky option. She would have said, oh, I'll go ahead and take 80% of my liver. Let's see what happens. Nobody would have done that. And I'm not saying that as an advocate. I'm saying that's what the ALJ judge decided was in fact the truth. So you're asking us to infer an adverse credibility determination from the legal conclusion that he reached. Does that apply? As well as the factual basis for those legal conclusions because the factual basis that Judge Ezra relied on that she was told about this grand scheme is belied by the determinations made by the ALJ. And consistent with Pogue, those determinations cannot be considered substantial evidence because the testimony was discredited. If you read the ALJ's decision and then you read the Mac's, you will wonder whether or not someone wasn't in Alice in Wonderland. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn. Thank you.
judges: O'scannlain, Tallman, Smith